WESTCHESTER FIRE INSURANCE COMPANY, Respondent, *v.* THE SYRACUSE, BINGHAMTON AND NEW YORK RAILROAD COMPANY and THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, Appellants, Impleaded with HATTIE E. ALVORD and Others, Defendants, and HONOR B. DOUGLAS and GILLIAN W. B. BAILEY, as Executors and Trustees of the Estate of WILLIAM R. BARR, Deceased, and Others, Respondents.

First Department, July 2, 1920.

**Railroads — suit by minority stockholders to compel cancellation of lease in perpetuity of railroad properties — lease construed — agreement that lessor shall issue its obligations at request of lessee — guaranty of payment of obligations of lessor by lessee — when lease will not be set aside in equity.**

Suit by minority stockholders of the Syracuse, Binghamton and New York Railroad Company, a domestic corporation, brought to set aside a lease of the property and franchises of said company to the Delaware, Lackawanna and Western Railroad Company, upon the ground, among others, that said lease, approved by the majority of the stockholders, is unfair and oppressive to the minority to the extent that a court of equity should interfere for the protection of the latter. It appeared that the lessee company owned the majority of the stock of the lessor and for many years had practically operated the lessor's road as part of its own system, chiefly for the purpose of transporting coal, in which the lessee had formerly engaged in mining, in connection with its railroad business. As the opera-

tion of such mines by the lessee was held to be illegal by the Supreme Court of the United States so that it could no longer execute its contract with the lessor for the transportation of coal, the lease in issue was prepared and approved by the directors and majority stockholders of both companies and also received the approval of the Public Service Commission subject to certain conditions which were subsequently fulfilled by the parties thereto. The lease demised all the properties and franchises of the lessor for the full term of its corporate existence and thereby the lessee assumed all the debts and obligations of the lessor and agreed to pay to the holders of the capital stock of the lessor interest at the rate of twelve per cent per annum upon the par value of their stock. The lessor was to maintain its corporate existence and at the request of the lessee to issue bonds or other obligations as might be required by the lessee for the purchase of railroad equipment, etc. The lessee agreed to maintain the property in good condition at its own expense, and the lessor reserved the right to rescind the lease if the lessee neglected to fulfill its obligations. The consent of the Public Service Commission to the execution of the lease was upon the express condition that the lessee should guarantee the payment of bonds and obligations which might be issued by the lessor which the lessee agreed to do. On all the evidence,

*Held,* that the lease, as approved by the majority of the stockholders of the lessor, was not oppressive and unfair to the minority stockholders because it required the lessor at the request of the lessee to execute bonds and other obligations to such amount as might be required by the lessee for the purchase of railroad equipment and the maintenance thereof and was not of such a nature that the lessee was not bound thereby; that the lease, construed most strictly against the lessee, impliedly bound it to guarantee the principal and interest of all obligations issued by the lessor at the request of the lessee, and that such was the real intent of the parties, and that, there being no suggestion or proof of bad faith or fraud on the part of either railroad company, the lease must be held to be fair and equitable and should not be set aside.

APPEAL by the defendants, The Syracuse, Binghamton and New York Railroad Company and another, from a judgment of the Supreme Court in favor of the plaintiff and certain of the defendants, entered in the office of the clerk of the county of New York on the 15th day of May, 1917, upon the decision of the court rendered after a trial of the New York Special Term setting aside and canceling a certain lease made by the Syracuse, Binghamton and New York Railroad Company to the Delaware, Lackawanna and Western Railroad Company.

The opinion of the Special Term is reported in *Westchester F. I. Co.* v. *S., B. & N. Y. R. R. Co.* (97 Misc. Rep. 471).

*Douglas Swift* of counsel [*Wilbur L. Ball* with him on the brief], *William S. Jenney*, attorney, for the appellants.

*Benjamin G. Paskus* of counsel [*Jacob Scholer* and *John E. Tracy* with him on the brief], *Frank M. Tichenor*, attorney, for the plaintiff, respondent.

*Oscar S. Blinn* of counsel [*Theodore L. Bailey*, attorney], for the defendants, respondents, Honor B. Douglas and Gillian W. B. Bailey, as executors, etc.

DOWLING, J.:

The plaintiff, Westchester Fire Insurance Company, a domestic corporation (hereinafter referred to as the Westchester Company), is the owner of 500 shares of the capital stock of the Syracuse, Binghamton and New York Railroad Company, a domestic railroad corporation (hereinafter referred to as the Syracuse Company).

The defendant Delaware, Lackawanna and Western Railroad Company, a foreign railroad corporation (hereinafter referred to as the Lackawanna Company), was the owner of 20,808 shares of the capital stock of the Syracuse Company at the time of the execution of the lease complained of, the remaining shares being owned by sixty-seven stockholders and at the time of the trial of this action it owned 21,557 shares.

The Syracuse Company was originally organized on July 2, 1851, under the General Railroad Law (Laws of 1850, chap. 140), as the Syracuse and Binghamton Railroad Company, and was reorganized in 1856 as the Syracuse and Southern Railroad Company, and the said name was thereafter changed by a special act of the Legislature of this State in 1857 (Laws of 1857, chap. 214) to the Syracuse, Binghamton and New York Railroad Company, its present name.

The total authorized capital stock of the Syracuse Company is $2,500,000, consisting of 25,000 shares of the par value of $100 each, all of which stock is issued and outstanding. This was the original amount of its authorized capital stock and the same has never been increased or decreased.

The railroad of the Syracuse Company is approximately eighty-one miles in length with about fifty-one miles of sidings, extending from Binghamton to Syracuse, N. Y. At

both termini it connects with leased lines of the Lackawanna Company.  At the former it connects with a line from Pennsylvania; at the latter with a line from Oswego, N. Y.

The Lackawanna Company is a Pennsylvania corporation, duly authorized to do business in the State of New York, and has a perpetual charter.  It owns and operates lines of railroad in Pennsylvania, and leases and operates lines of railroad in New York and New Jersey.  Its system includes a double-track main line extending from Hoboken, N. J., to Buffalo, N. Y.

On January 8, 1858, the Lackawanna Company entered into a trackage contract with the Syracuse Company, and this marked the beginning of the relationship between the two roads.  The Lackawanna Company at that time was a large owner of anthracite coal lands in Pennsylvania, and was engaged in mining its coal and transporting it in interstate commerce to markets in various States.  A large part of its coal was marketed in Canada and points in northern and western New York, and in order to reach such markets it sought and by this contract obtained trackage rights over the Syracuse Company's road from Binghamton to Syracuse.

In this contract the Syracuse Company agreed to allow the use of its tracks to the Lackawanna Company for the purpose of transporting coal thereon, and to keep said tracks in good running order.  The Lackawanna Company agreed to bear the entire expense of the operation of its trains over said road, including that of loading and unloading coal and other freight; to pay the Syracuse Company one cent per ton per mile for all coal transported by it over said road, or any portion thereof; to make said road " its principal avenue for the transportation of coal destined for the Lakes, Canada and points in northern and western New York; " and to transport at least 100,000 tons of coal over said road each year.  No charge was to be made for returning empty coal cars over the road, but the Lackawanna Company was given the right to transport other freight in such returning coal cars, and it agreed to pay for freight so transported one cent per ton per mile.  The contract provided for a revision of the rate of compensation at the end of each five-year period at the instance of either party.  It was agreed that the contract should remain in

force during the existence of the charters of the respective companies and the renewals of such charters.

In November, 1877, the contract was amended by reducing the trackage rate from one cent per ton per mile to one-half cent per ton per mile; and the latter rate continued in effect until upon the decision of the United States Supreme Court in the so-called *Commodities Case* the performance of the contract by the Lackawanna Company became unlawful and it was discontinued, as will be more fully explained hereinafter.

Upon the execution of this contract in 1858 a heavy movement of the Lackawanna Company's coal over the Syracuse Company's road began. The importance of this traffic to the Syracuse Company during the period from 1902 to 1912 may be judged from the fact that the earnings therefrom varied from $335,422.69 in the former year, to the minimum amount of $299,061.45 in the latter, reaching the maximum of $481,999.71 in the year 1907.

On December 22, 1873, the Lackawanna Company purchased 13,268 shares of the capital stock of the Syracuse Company, carrying with it the control of the road. From time to time thereafter it purchased additional stock until on July 31, 1907, it owned 19,389 shares. On that date, pursuant to the requirements of the Public Service Commissions Law (Laws of 1907, chap. 429, § 54) then in force, it applied to the Public Service Commission, Second District, and received permission to purchase any or all of the remaining stock of the Syracuse Company. Thereafter it purchased from time to time additional stock until on December 6, 1911, the date of the stockholders' meeting of the Syracuse Company at which the lease in question was approved, it owned 20,808 shares; on December 30, 1912, the date on which this action was started, it owned 21,041 shares; and on October 28, 1915, the date of the trial of this action, it owned 21,557 shares, including the qualifying shares of the directors of the Syracuse Company.

By virtue of its stock control and the said contract of 1858, the Lackawanna Company since 1873 has practically operated the Syracuse Company's road as a part of the Lackawanna system. While the Syracuse Company had some equipment, a few locomotives and cars, most of the equipment for the

road was furnished by the Lackawanna Company. Separate books of account have been kept for the Syracuse Company and separate reports have been made to the various governmental bodies.

In 1909 the Supreme Court of the United States handed down its decision in the so-called *Commodities Case* (*United States* v. *Delaware & Hudson Co.*, 213 U. S. 366). The effect thereof upon the relations between the Syracuse and Lackawanna Companies was thus testified to by Mr. William S. Jenney, vice-president and general counsel of the latter company: " The decision in the Commodity case so far as the Lackawanna Railroad was concerned, the Lackawanna not only was engaged in the railroad business, but was engaged in manufacturing and mining coal, and in transporting that coal to the market in Interstate Commerce. After the decision in the Commodity case, the effect of the decision upon the business of the railroad was that it was no longer able to transport that coal in Interstate Commerce, and had to sell the coal at its mines in Scranton, Pennsylvania, Therefore it could no longer execute the contract with the Syracuse Railroad, under which it agreed to transport over that railroad 100,000 tons of coal a year on the average, and after that decision it had to sell all its coal in the ordinary course of business, and made a contract with another corporation to sell the coal at the coal mines at Scranton. Therefore, it had no further coal to ship over the Syracuse Railroad under this contract."

Various solutions presented themselves for the changed conditions necessitating new arrangements between the two companies. The Lackawanna Company sought to purchase the entire capital stock of the Syracuse Company, but there were 4,192 shares of stock which it was unable to purchase at what it deemed a reasonable price. Various improvements on the Syracuse Company's road were required to be made, involving large expenditures of money, such as double tracks, rock ballasting, elimination of grade crossings and a new freight yard at Syracuse. These called for an aggregate expense of over $2,000,000. Finally the lease in question was prepared by the Lackawanna Company and approved by its directors. It was then submitted to the stockholders of the Syracuse

Company at their annual meeting on December 6, 1911, after notice of the proposed action duly given. After having been read in full at the meeting it was approved by more than two-thirds of the stock. The Lackawanna Company voted its holding of 20,763 shares in favor of the lease, 45 shares in favor were cast by officers and directors of the Syracuse Company, and 2,270 other shares were voted in favor also, making a total of 23,078. Of the remaining shares, 1,307 were not represented, and 615 shares were voted in opposition to the lease, of which plaintiff voted 500 shares and filed a written protest against its approval, among other reasons, on the ground that it would entail severe financial loss to it as a stockholder, that it would place beyond its control its ownership in a very valuable property, that the rental income was far below the present book value or market value and that the earning capacity of the Syracuse road was far in excess of the twelve per cent contemplated as payment under the lease.

Subsequently shareholders owning 224 shares, not represented at the meeting, gave their written approval to the lease.

On the same day, December 6, 1911, at the annual meeting of the board of directors of the Syracuse Company, the following resolution was adopted:

" WHEREAS it is deemed an advantage to this company to enter into a contract of lease of its railroad property and franchises with the D. L. & W. Railroad Company, *resolved:* That a draft of lease of the Syracuse, Binghamton and New York Railroad Company, submitted to this meeting and attached hereto be and the same is hereby approved, subject to approval thereof of the stockholders of this company, and that the President and Secretary of this company are hereby authorized and directed to execute and deliver said lease on behalf of this company and do and perform all such other acts and things and make, execute, deliver and file all documents and contracts which may be required by the laws of the State of New York to render said lease valid and effectual.

" Be it also *resolved* that all surplus money in the treasury of this company at the date of the taking effect of said lease be distributed as a cash dividend to the stockholders."

In February, 1912, the proposed lease was approved by a two-thirds vote of the stockholders of the Lackawanna Company at their annual meeting and on the same day the directors of that company also duly approved the lease and authorized the execution thereof.

The lease thus authorized by the stockholders and directors of both companies is summarized as follows:

The lessor (Syracuse Company) granted and demised to the lessee (Lackawanna Company) the railroad and all the property, real and personal, appurtenant thereto, owned by the lessor, and all the franchises, powers and privileges belonging to the lessor, for the full term of the corporate existence of the lessor, and all renewals thereof. The lessor also assigned to the lessee all contracts, agreements, credits and accounts of the lessor. The lessee agreed to assume and pay all the then existing debts and obligations of the lessor, and all taxes and assessments imposed during its possession and enjoyment of the demised property, and during its said enjoyment under the lease to pay to the holders of the capital stock of the lessor interest at the rate of twelve per cent per annum upon the par value of their stock. The lessor agreed to maintain its corporate organization, and at the request of the lessee to issue bonds, other obligations or stock, or part bonds, part obligations and part stock, in such amount and to such extent as might be required by the lessee for the purchase of equipment, or for the construction of extensions, additions or improvements on the leased property, the cost of which was properly chargeable to construction account, and to issue such other bonds, obligations and securities at the request of the lessee as were required from time to time to retire, refund, pay or discharge the bonds or other obligations theretofore issued as they matured. The lessee agreed to do and perform all acts and things which the lessor, as owner of the property and franchises, would be bound by law to do and perform had the lease not been made. The lessee agreed to maintain the property in good condition at its own expense, and at the termination of the lease to deliver up all the property with any improvements thereon in as good order as at the execution of the lease. It was provided that all assets of the lessor, upon the execution of the lease, should be delivered to the lessee

to be used by it in payment of the debts and liabilities of the lessor. It was provided that if the lessee neglected for a period of six months to pay interest upon the mortgage bonds of the lessor, or interest at the rate of twelve per cent per annum on the capital stock, as provided in the lease, then the lessor might at its option within ninety days after such default, but not afterward for that default, terminate the lease and take back the property, and that such repossession by the lessor should not vitiate or discharge any legal claim it might have against the lessee by reason of any breach of the lease accruing at or before the time of such repossession. The lease further provided that the lessor should, during the period of at least thirty days before taking repossession, publish in two newspapers printed in the city of New York a notice to the stockholders of the lessee of such default and intention to resume possession, and that the lessee might at any time before the expiration of the thirty days' notice stay all further proceedings by the payment of the amount then due. The lessor agreed that it would not after the date of the lease make, execute or issue, or cause or permit to be made, executed or issued, any bond or obligation or stock unless requested so to do by the lessee, and that it would do and perform at the expense of the lessee all such lawful acts and things as might be requested by the lessee in order to enable the lessee to enjoy and use the property, franchises and rights demised, as fully to all intents and purposes as the lessor might have done if the lease had not been made.

At this time the financial condition of the Syracuse Company was as follows: Its original funded debt of about $2,000,000 had been completely paid off by 1909 out of net earnings, and on October 1, 1912, it had no outstanding bonded or other indebtedness. For a great many years it had been doing continuously a very profitable business. On September 30, 1912, it had no liabilities, an appropriated surplus of $195,420.74, and an unappropriated surplus of $2,865,898.67 in excess of its capital stock of $2,500,000. Its average income for the five years preceding was twenty-five per cent, and it had paid dividends of eight per cent from 1903 to 1909 inclusive, nine per cent in 1910, and ten per cent in 1911. Its gross income for 1911 was $634,558.25, and its net income

$557,704.92. The profit and loss account had increased from $507,622 in 1902 to $2,865,898.67 in 1912.

On March 7, 1912, an application was made by both parties to the lease to the Public Service Commission of New York, Second District, for the approval of the lease pursuant to section 148 of the Railroad Law and section 54 of the Public Service Commissions Law (as amd. by Laws of 1911, chap. 788).* The Commission held public hearings at which opposition was made to the lease by plaintiff, owning 500 shares, by Robert Goelet (who had not voted at the stockholders' meeting), owning 200 shares, and by William I. Walter (who had voted against the lease), owning 90 shares. Their objections were based on the grounds that the rental was inadequate and that the transaction constituted virtually a sale of the property to the lessee. On August 15, 1912, the Commission handed down its decision approving the proposed lease with an opinion wherein it held that the lease was not objectionable from the point of view of the public; that the control of the Syracuse road and its operation by the Lackawanna had been beneficial to the stockholders and to the public, and that the only possible objection to the lease from the view point of the public was that the rental was excessive, continuing as it must through a very long period of years. As to the rights of the minority stockholders, the Commission held that they had been safeguarded and considered in the making of the lease, and that the rental provided could not be criticised as insufficient, as there was no assurance of the continuance of the earnings theretofore made upon the capital stock of the Syracuse Company under such exceptional circumstances. Indeed, the Commission said that: " It is apparent that if the earnings should continue for any substantial length of time as great as they have been recently, it would be the duty of this commission or other public authority to reduce rates to such an extent as would bring the earnings down to a reasonable sum. A lease which would secure in practical perpetuity a rental of from 20 to 25 per cent. would not and could not be approved by this commission. If there is to be any substantial objection made to this lease, it is that

* Since amd. by Laws of 1914, chap. 220.— [Rep.

for the term in question the rental is too great instead of too small."

Attention was called in the opinion to the fact that only 815 shares were opposing the lease out of 4,192 shares not controlled by the Lackawanna road, and it concluded that the advantages in the way of operation, improvement of facilities and the like were sufficient in the judgment of the Commission to warrant the leasing of the road to the Lackawanna. The Commission, however, in giving its approval to the proposed lease pursuant to section 54 of the Public Service Commissions Law, did so upon the following condition:

" (3) That the permission and approval herein given are upon the express condition that the board of managers of the Delaware, Lackawanna and Western Railroad Company shall adopt a resolution to the effect that in the event that the Delaware, Lackawanna and Western Railroad Company shall request the Syracuse, Binghamton and New York Railroad Company to issue any bonds pursuant to the terms of said lease, the said The Delaware, Lackawanna and Western Railroad Company will guarantee the payment of the said bonds, a certified copy of such resolution to be filed with this commission, and upon such filing the permission and approval herein become effective."

On September 26, 1912, the board of directors of the Lackawanna Company complied with this condition by passing the following resolution: ,

" On motion, *Resolved* by the Board of Managers of the Delaware, Lackawanna and Western Railroad Company, that in the event that the Delaware, Lackawanna and Western Railroad Company shall request the Syracuse, Binghamton and New York Railroad Company to issue any bonds pursuant to the terms of the lease contracted by the said company, and dated October 1, 1912, the Delaware, Lackawanna and Western Railroad Company will guarantee the payment of such bonds."

Thereafter on January 23, 1913, an order was made by the Commission reciting that " as required by this Commission, there has been filed with it a copy of a resolution by the board of managers of the Delaware, Lackawanna and Western Railroad Company, certified by the secretary of said company to

the effect that in the event that The Delaware, Lackawanna and Western Railroad Company shall request the Syracuse, Binghamton and New York Railroad Company to issue any bonds pursuant to the terms of said lease, the said The Delaware, Lackawanna and Western Railroad Company will guarantee the payment of the said bonds."

and ordering: " (1) That the permission and approval of this Commission be and hereby are given pursuant to section 148 of the Railroad Law, that The Delaware, Lackawanna and Western Railroad Company and the Syracuse, Binghamton and New York Railroad Company may contract for the use of the road and route of the Syracuse, Binghamton and New York Railroad Company in manner and form as proposed by the lease submitted to this Commission and filed with the papers herein, and thereafter use the said road in such manner and for such time as prescribed in said lease.

" Ordered (2) That the proposed lease or agreement between The Delaware, Lackawanna and Western Railroad Company and the Syracuse, Binghamton and New York Railroad Company for the leasing of the railroad of the Syracuse, Binghamton and New York Railroad Company and all of the franchises of said company, be and hereby is approved pursuant to section 54 of the Public Service Commissions Law."

On or about October 1, 1912, the lease was executed by the Syracuse Company to the Lackawanna Company, which ever since has been in possession of the railroad in question and of the property demised in said lease.

On November 4, 1912, the surplus money in the treasury of the Syracuse Company was, pursuant to the resolution of its board of directors hereinbefore referred to, distributed in the form of an extra dividend of thirty per cent to its stockholders, which they all accepted, including plaintiff.

The effort to set aside the lease in question is made by plaintiff, owning five hundred shares of stock of the Syracuse Company. Between the commencement of the action and the time of the trial it was joined in its attack upon the validity of the lease by the executors of the Barr estate, owning two hundred shares. The United States Trust Company, as guardian of Mary M. McLeod Cameron, owning nineteen shares, and the same company, as trustee of the will of

Lawrence Turnure, deceased, owning twenty-three shares, appeared on the trial and stated it joined with the plaintiff in asking the relief sought; but these forty-two shares had been voted by proxy in favor of the lease at the stockholders' meeting, and the trust company has accepted the shares of the rental accruing to such forty-two shares under the lease in question. Plaintiff and the executors of the Barr estate accepted the dividend of thirty per cent, but returned and refused to accept the checks for their proportion of the rental reserved under the lease.

The grounds upon which plaintiff seeks to have this lease canceled and set aside are:

(1) That it is *ultra vires*, and is not in fact a lease, nor a contract for the use of a railroad, but a contract for the sale of all the property, assets and franchises of the Syracuse Company to the Lackawanna Company, which the law does not authorize.

(2) That the Lackawanna Company, being the owner of over eighty-five per cent of the stock of the Syracuse Company, occupies, as the majority stockholder, the position of a trustee towards the minority stockholders, and where the majority stockholder deals directly with the trust property for its own benefit, a court of equity will, at the instance of a minority stockholder, set the transaction aside without any inquiry as to whether or not the transaction is fair or unfair. The lease in question, however, being not only unfair but oppressive to the minority stockholders, it will be declared void at the instance of such a stockholder.

(3) The board of directors of the Syracuse Company did not and could not exercise any will of their own in entering into the lease with the Lackawanna Company, but merely carried out the orders of the Lackawanna Company for whom they were in fact acting. Under such circumstances a court of equity will set aside the transaction at the instance of any stockholder without proof that the transaction was fraudulent or disadvantageous to the company.

(4) The terms of the lease are burdensome, unfair and oppressive to the minority stockholders of the Syracuse Company, and give the Lackawanna Company all the rights of a purchaser, with the added advantage of being able to

rid itself of its purchase whenever it desires, without further liability.

(5) The lease cannot be reformed.

(6) The Lackawanna Company has failed to prove that the transaction was a fair one.

(7) The act of the Public Service Commission in approving the lease does not make the transaction *res adjudicata.*

The learned trial court has disposed of most of the objections adversely to the respondents. It has, however, granted judgment in favor of plaintiff upon one specific ground, which is the sole subject for consideration upon this appeal. That ground is, that the action of the majority of the stockholders of the Syracuse Company has been so plainly unfair and oppressive of the minority that the court should interfere for the protection of the latter. Judgment was accordingly directed: (1) That the lease in question be canceled, set aside and declared to be null, void and of no effect; (2) that peaceable possession be delivered by the Lackawanna Company to the Syracuse Company of all property received under the lease, or thereafter acquired, as well as all property, if any, thereafter acquired by means of the bonds, obligations or stock issued by the Syracuse Company; (3) that the Lackawanna Company account for and pay over all moneys and property received by it pursuant to the terms of the lease, less the amount paid to the stockholders of the Syracuse Company thereunder; (4) that plaintiff have costs and (5) an allowance; (6) that the Syracuse Company upon receiving back its property shall pay to its stockholders who have refused to accept the payments of twelve per cent from the Lackawanna Company under the lease, a sum equal to what they would have received thereunder, with interest; (7) that plaintiff or the Syracuse Company may apply for any necessary further order or decree to effectuate the provisions of the judgment.

The conclusion reached by the learned trial court was based on the terms of the following provisions of article 1 of the lease:

" The said party of the first part [Syracuse Company] shall from time to time, during the continuance of this lease, upon the request of the said party of the second part [Lackawanna Company] make, execute, issue and deliver to the party of

the second part, the bonds, other obligations or stock of the said party of the first part, or part bonds, part other obligations, and part stock, as the said party of the second part may request, for such amount and to such extent as may be required by the said party of the second part for the construction and purchase of locomotives, machinery, cars and other equipment for said railroad, and for the construction of buildings and structures, and for the construction of any extensions or branches, or additional tracks, or any other railroads, which the said party of the second part may, in the exercise of the rights possessed by, or that may be hereafter possessed by the said party of the first part under the laws of the State of New York or otherwise, desire to have constructed, and for the enlargement, increase, or reconstruction of the railroad and its structures, equipment, and facilities, and for all other things, work or works, which the said party of the second part may desire to have done in the exercise of said rights, the cost of which is properly chargeable to construction account. And the said party of the first part shall also, upon the request of the said party of the second part, make, issue and deliver to the party of the second part, such other bonds, obligations and securities which may be required from time to time to retire, refund, pay or discharge or replace the bonds or other obligations theretofore issued, as the same shall mature and become payable to the principal. And the said party of the second part shall, during the continuance of this Indenture, use and operate the said railroad, and do and perform all acts and things which the party of the first part, as owners of the property and franchises hereby demised, would be bound, by law, to do and perform had this Indenture not been made. And the said party of the second part may and shall, at its own cost and expense, assert and by all lawful means enforce and defend, the corporate rights, franchises and property hereby demised."

The court found that under these provisions the Lackawanna Company was not bound by anything in the lease to pay or to guarantee the payment of either the principal or the interest of such new bonds. It held that the obligation of the company was limited to the assumption of the debts existing at the time of the making of the lease and these were so small as to

be comparatively negligible.   In its opinion the court advanced the argument that the lease provided an easy and certain avenue of escape for the Lackawanna Company if its contract should become burdensome, as, if the time ever came when the rental value of the demised property in its present form becomes less than the rent reserved, then all the lessee had to do was to make the experiment of additional expenditures for improvements or extensions which would fall upon the lessor exclusively as the lease did not bind the lessee to become responsible for them even secondarily as guarantor.   If the expenditures proved profitable the lessee could continue the payment of the twelve per centum per annum and greatly increase its profits, but if the experiment proved unprofitable and the earning power fell below the twelve per centum per annum to be paid on the stock then the Syracuse Company would have to stand the loss.   The court said that the Lackawanna Company in such a situation would pay the twelve per centum stipulated and leave the interest on the new bonds unpaid, and the only penalty for its failure would be the forfeiture of its right to continue the lease.   The court said further that in such event the only alternatives open to the Syracuse Company would be to pay the bond interest out of the twelve per centum rental received by its stockholders and continue the lease, or to exercise its option to terminate the lease because of the failure of the Lackawanna Company to pay such bond interest.   This, it will be seen, is entirely inconsistent with the prior conclusion of the learned court that the Lackawanna Company was under no obligation whatever to pay such bond interest and, therefore, its failure to pay the same could not be a ground for forfeiture of the lease.

The question of the true intent and meaning of the provisions of article 1 above quoted was not raised upon the trial of this action, nor is it suggested by anything which occurred upon the trial.   The statement is made that the question was first raised upon the submission of the briefs to the trial court. Whether this be so or not the fact remains that the record is barren of any suggestion that this was the ground upon which the validity of the lease would be attacked.   The infirmities in the lease relied upon at the trial have been found by the trial court not to exist.   Had this particular question

been raised the appellants would have been free to present proof of the actual intent of the parties when the lease in question was made in regard to the liability for the new obligations to be issued by the Syracuse Company. It is suggested that the real intention of the parties to the lease might now be effectuated by a reformation of the instrument if there should be found to be any ambiguity or uncertainty therein; but such relief could not now be granted in view of the failure to plead facts upon which a reformation might be based, and by the further failure to ask for such reformation in the answers of the appellants. I think it is fairly to be inferred from the record that the plaintiff did not deem this a sufficient ground of attack upon the lease at the trial and that neither side deemed it controlling on the main issue involved. Nor is this surprising in view of the action of the Public Service Commission in approving the lease subject to the condition that the Lackawanna Company should adopt a resolution that if it requested the Syracuse Company to issue any bonds pursuant to the terms of the lease the Lackawanna Company would guarantee the payment of the same. The resolution of the board of directors of the Lackawanna Company to this effect was adopted prior to the date of the lease and before it was to commence. It may well be that since such action accepted the theory of liability for said bonds on the part of the Lackawanna Company nobody deems that any further legal question could arise as to the same.

Objection is now raised, however, upon the ground that the action of the Public Service Commission applied only to bonds and not to stock or obligations issued by the Syracuse Company, and furthermore that the action of the Commission was taken only to protect the outside public who might buy such bonds, and with no purpose or power to protect minority stockholders, and that such action might thereafter be changed by a new Commission so as to no longer remain effective.

In my opinion all these objections are met by giving to the provisions of the lease a fair and reasonable construction in view of the surrounding circumstances which the parties are presumed to have considered when their minds met. This is a lease for the term of the corporate charter of the lessor and all renewals thereof, that is, a lease in perpetuity. It covers

all property, franchises, rights and assets of the lessor of
every nature, kind and description. All that was left to the
lessor were its corporate name, its corporate existence and
its right to re-entry in case of a breach of the terms of the
lease by the lessee. The lessee was to pay a rental of twelve
per cent on the par value of the stock of the lessor, such
payment to be made not to the officers of the lessor but directly
to its stockholders. It was realized that no railroad could
exist without. changes, additions or improvements being made
from time to time; that new equipment, extensions, branches,
tracks and other improvements must be made; and as the
lessor had no property of any kind left in its possession and
had no further control over the operation of its road any
new work must be initiated and carried on by the lessee.
As the lessee was to derive the entire profit from the road
over and above the twelve per cent rental, any profitable
new work would inure to the benefit solely of the lessee, and
the stockholders of the lessor were guaranteed their rental
no matter what the result of the operation of the road might
be, so that all the risk was assumed by the lessee. It was
to the interest of the lessee to keep the identity of the leased
road intact as a link in its system and, therefore, instead of
issuing its own securities for the cost of improvements it was
provided that such improvements should be paid for by the
obligations of the lessor. Over the nature, extent, cost and
control of these extensions and improvements the lessor had
no control, nor could it determine the nature of the securities
to be issued in payment therefor. All these were under the
sole domination of the lessee. Nor had the lessor any property
of any kind from which to pay either the principal or interest
of the new obligations as it has parted with all its property
and the rental was to be paid direct to its stockholders. I
do not see any escape from the conclusion that the reasonable
interpretation to be placed upon this lease, which is to be
strictly construed against the lessee because of its control
by stock and directors of the lessor, is that the Lackawanna
Company impliedly agreed to guarantee the principal and
interest of any bonds, other obligations or stock which the
Syracuse Company may issue at the request of the Lackawanna
Company. Both the lessor and lessee agree that this is the

construction to be placed upon the lease and that that was the real intent of the parties. This is the interpretation which it seems to me after reading the whole lease and in view of the surrounding circumstances at the time of the making of the lease as shown by this record, the court would have reached if the question had arisen in a controversy between the Syracuse Company and the Lackawanna Company. There is no suggestion that this lease was not made in good faith, nor is there any claim that there was a deliberate and purposed fraud sought to be practiced by the Lackawanna Company upon the Syracuse Company for the purpose of escaping liability under this lease or to the end that the Syracuse Company might be ruined for the benefit of the Lackawanna Company. I think everything before us demonstrates that this lease was made in good faith and that it was a fair and equitable one, and while the language employed was not sufficiently clear to create an express promise, that one must be implied from all the facts and circumstances.

It is to be noted that the bonds, other obligations or stock which the Syracuse Company may be called upon to issue under the terms of the lease are not to be delivered to any third parties or to purchasers but are to go directly to the Lackawanna Company. As that company initiates the improvements, incurs the expense and directs the distribution of the money, realizing the profits which may flow from the operation, so also it must be held to have impliedly promised to guarantee the payment of both principal and interest of any securities so issued at its request in order that the Syracuse Company may never be at any loss therefrom. Furthermore the provision for the issuance of the new securities to redeem existing ones as may from time to time be required includes such securities as might be hereafter issued upon the demand of the lessee, and indicates clearly that the financial operations are to be conducted solely by the lessee which has this implied obligation to stand behind such securities. At the time the lease was made there were no outstanding mortgage bonds of the Syracuse Company so that this provision can refer only to the discharge of bonds issued as provided by the lease upon the Lackawanna Company's request.

I conclude, therefore, that as a matter of law upon the record in this case the lease in question must be construed to mean that the Lackawanna Company thereby agreed to guarantee the payment of any bonds, other obligations or stock which the Syracuse Company might issue at its request pursuant to the provisions of article 1 of the lease.

The judgment appealed from will, therefore, be reversed and the complaint dismissed and new and appropriate findings will be made in accordance with this decision. In view of the fact, however, that any uncertainty which may have been deemed to exist arose because of the language of the lease which was drawn by the lessee, the reversal will be without costs.

Clarke, P. J., Laughlin, Page and Merrell, JJ., concur.

Judgment reversed, without costs, and complaint dismissed. Settle order on notice.